# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ABLINE CANNON, | CASE NO. 1:21-CV-1846-JRA |
| Petitioner, | JUDGE JOHN R. ADAMS |
| vs. | MAGISTRATE JUDGE DARRELL A. CLAY |
| WARDEN DAVE BOBBY, | **REPORT AND RECOMMENDATION** |
| Respondent. | |

On September 28, 2021, Petitioner Abline Cannon, a prisoner in state custody, filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. (ECF #1). On February 24, 2022, Respondent Warden Dave Bobby, in his official capacity as Warden of the Northeast Correctional Center, filed a Return of Writ that included the state court record and six volumes of transcripts. (ECF #11). Mr. Cannon filed a Traverse to Return of Writ on March 10, 2022. (ECF #12).

The District Court has jurisdiction over the petition under § 2254(a). On December 22, 2021, this matter was referred to me pursuant to Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Jan. 3, 2021). As explained below, I recommend the District Court **DISMISS** Grounds One and Two and **DENY** any relief on Ground Three. I further recommend the District Court **DENY** Mr. Cannon a certificate of appealability.

1

PROCEDURAL HISTORY

A.  **Factual findings of the Court of Appeals**

The Ohio Court of Appeals, Ninth Appellate District, set forth the facts of this case on direct appeal. These factual findings are presumed correct unless Mr. Cannon rebuts this presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). The Ninth District determined:

{¶ 2} During the middle of the night, two armed men broke into D.B.'s apartment. When they broke in, D.B. was in his bedroom and his twin brother was sleeping on the living room couch. The twin brother attempted to jump from the couch, but one of the intruders struck him on the head. Gunfire then erupted and shots were exchanged between the two men and D.B. After the exchange, the two men fled, and the twin brother briefly chased them. When he returned to the apartment, he found D.B. lying on his bedroom floor and called 911. Paramedics were unable to resuscitate D.B., and he died from his injuries.

{¶ 3} Dark conditions in the apartment made it impossible for D.B.'s twin brother to identify the intruders by sight, but he advised the police that one of them had left a bloodstain on the wall next to the door as he fled. The police also found a trail of blood leading down the stairwell and across the apartment complex's parking lot. Believing that one of the intruders had been shot, the police asked local hospitals to be on the lookout for anyone seeking treatment for a gunshot wound. Within twenty minutes of that notification, Cannon arrived at Elyria Medical Center with a gunshot wound to his right arm.

{¶ 4} The police spoke with Cannon at the hospital, and he denied any involvement in the break-in at D.B.'s apartment. Although the police secured a warrant for his arrest, Cannon left the hospital against medical advice before the warrant could be served. The police then experienced several setbacks when they tried to find him. Cannon's family members changed their stories several times when asked for information about his whereabouts. Additionally, someone set fire to and destroyed the vehicle that had brought him to the hospital. Cannon managed to elude the police for almost four weeks. He was eventually captured while attempting to hide under a pile of clothes at the apartment of a lady friend. DNA testing conducted after his arrest confirmed that he could not be excluded as the source of the blood trail found at D.B.'s apartment.

{¶ 5} A grand jury indicted Cannon on one count of aggravated murder, one count of murder, one count of felony murder, one count of kidnapping, two counts of

2

aggravated robbery, two counts of aggravated burglary, three counts of felonious assault, one count of tampering with evidence, and two counts of having weapons under disability. Of those fourteen counts, eleven counts also contained an attendant firearm specification. The matter proceeded to trial and, at its conclusion, a jury found Cannon guilty of thirteen counts and the specifications linked to those counts. The jury found him not guilty of murder.

(ECF #11-1 at PageID 302-17; *see also State v. Cannon*, No. 19CA011536, 2020 WL 4049925 (Ohio Ct. App. July 20, 2020), *appeal not allowed*, 153 N.E.3d 114 (Ohio 2020) (table)). Additional factual findings of the Ninth District are discussed further below.

**B.      State court conviction and sentence**

On February 17, 2017, a Lorain County Grand Jury indicted Mr. Cannon on one count of aggravated murder, in violation of Ohio Revised Code § 2903.01(B); two counts of murder, in violation of Revised Code §§ 2903.02(A) and (B); one count of kidnapping in violation of Revised Code § 2905.01(A)(2); two counts of aggravated robbery in violation of Revised Code §§ 2911.01(A)(1) and (3); two counts of aggravated burglary in violation of Revised Code §§ 2911.11(A)(1) and (2); three counts of felonious assault in violation of Revised Code §§ 2903.11(A)(1) and (2) (two counts of the latter); one count of tampering with evidence in violation of Revised Code §§ 2921.12(A)(1); and two counts of having weapons under disability in violation of Revised Code §§ 29223.13(A)(2) and (3). (ECF #11-1 at PageID 76-82). The aggravated murder, murder, kidnapping, aggravated robbery, aggravated burglary, and felonious counts each contained a firearm specification. (*Id.*). He was arraigned on February 23, 2017 and pled not guilty. (ECF #11-1 at PageID 84).

Trial began on August 20, 2018. (ECF #11-1 at PageID 102). After the State completed its case-in-chief, Mr. Cannon moved for a judgment of acquittal under Rule 29 of the Ohio Rules of

3

Criminal Procedure, which the trial court denied. (*Id.*). Following the defense resting, Mr. Cannon renewed his Rule 29 motion, which the trial court again denied. (*Id*).

The jury began deliberating on the afternoon of August 27, 2018. (*Id.*) Following a full day of deliberations on August 28th, the jury returned its verdict shortly before noon on August 29, 2018. (*Id.* at PageID 103). It acquitted Mr. Cannon of the murder charge, but convicted him on all other charges, as well as the accompanying firearm specifications. (*Id.*) The trial court revoked his bond and scheduled sentencing for August 30, 2018. (*Id.*).

At sentencing, Mr. Cannon again moved for a Rule 29 acquittal; again, it was denied. (*Id.*). "The parties stipulated to a merger analysis of allied offenses of similar import and [Mr. Cannon] was sentenced." (*Id.*). "Sentencing will occur based upon the parties' joint recommendation only on Count 1, aggravated murder, with a firearms specification; Count 11, felonious assault, with a firearms specification as it relates to [D.B.]; Count 12, tampering with evidence; and Count 14, having weapons under disability." (ECF #11-7 at PageID 1344). Further, the parties agreed there would only be one sentencing for a firearm specification "despite the fact that there are actually two convictions for the firearms specifications . . . ." (*Id.*). The court imposed a sentence of life with no possibility of parole for 30 years on the aggravated murder conviction; an additional 4.5 years for the firearm specification to that offense; 4 years on the felonious assault conviction, to run consecutive to the murder and firearm specification sentence; 1.5 years for the tampering with evidence conviction, to run consecutive to the other charges; and 1.5 years on the having weapons under disability charge, to run concurrent to all other charges. (*Id.* at PageID 1354-55). This resulted in "a total aggregate sentence of parole after 40 years; Count 14, having weapons under disability, 18 months will run concurrent to all other sentences." (*Id.* at 1355).

4

The state court record does not contain a written judgment consistent with the trial court's oral pronouncement of sentence on August 30th, but it appears one issued on September 6, 2018. (*See* ECF #11-1 at PageID 105). On September 19, 2018, the trial court docketed an Amended Judgment Entry of Conviction and Sentence *Nunc Pro Tunc*. (*Id.*). The amended entry sentenced Mr. Cannon to life with eligibility for parole after 30 years on the aggravated murder count; 4 years on the felonious assault count; 1.5 years on the tampering with evidence count; and 1.5 years on the having weapons under disability count. (*Id.* at PageID 106-07). Further, an additional term of 54 months was imposed on the aggravated murder count "as a mandatory and consecutive term pursuant to Ohio Rev. Code § 2929.14(B)(1)(a)(v), to be served before any other time is served." (*Id.* at PageID 107). The amended judgment also provided:

> COUNTS 1, 11, AND 12 SHALL RUN CONSECUTIVE TO EACH OTHER AND CONSECUTIVE TO THE 54 MONTH FIREARM SPECIFICATION FOR A TOTAL SENTENCE OF LIFE WITH ELIGIBILITY OF PAROLE AFTER 40 YEARS.  COUNT 14 SHALL RUN CONCURRENT TO ALL OTHER COUNTS.
>
> AGGREGATE SENTENCE OF: LIFE WITH ELIGIBILITY OF PAROLE AFTER 40 YEARS.

(*Id.*)

## C.    Direct appeal

On October 5, 2018, Mr. Cannon filed a Notice of Appeal to the Ninth District. (ECF #11-1 at PageID 112). On November 8, 2018, the Ninth District issued an order questioning the finality of the trial court's amended judgment entry, noting it was "unclear" if the 54-month term "applies to only one unspecified firearm specification." (*Id.* at PageID 114-15).

On November 29, 2018, Mr. Cannon sought to amend his notice of appeal. (*Id.* at PageID 117-18). Then, on January 29, 2019, the Ninth District issued an order questioning whether the

trial court's September 19, 2018 entry constituted a final appealable order because it "does not appear to enter a sentence as to the firearm specification in Count 11." (*Id.* at PageID 164). Following briefing from the parties, on March 13, 2019, the Ninth District dismissed Mr. Cannon's appeal, finding that "neither the September 6, 2018, entry nor the September 19, 2018, 'nunc' entry, enters a sentence as to the firearm specification in Count 11. Therefore, the order is not a final judgment of conviction." (*Id.* at PageID 170).

On April 1, 2019, the trial court issued a Second Amended Judgment Entry of Conviction and Sentence *Nunc Pro Tunc.* (*Id.* at PageID 173-78). Once again, the trial court sentenced Mr. Cannon to life with eligibility for parole after 30 years on the aggravated murder count; 4 years on the felonious assault count; 1.5 years on the tampering with evidence count; and 1.5 years on the having weapons under disability count. (*Id.* at PageID 174-75). Further, an additional term of 54 months was imposed on the aggravated murder count "as a mandatory and consecutive term pursuant to Ohio Rev. Code § 2929.14(B)(1)(a)(v), to be served before any other time is served." (*Id.* at PageID 175). The amended judgment also provided:

> ALL OTHER FIREARM SPECIFICATION[S] ARE MERGED INTO THE FIREARM SPECIFICATION UNDER COUNT 1.
>
> COUNTS 1, 11, AND 12 SHALL RUN CONSECUTIVE TO EACH OTHER AND CONSECUTIVE TO THE 54 MONTH FIREARM SPECIFICATION FOR A TOTAL SENTENCE OF LIFE WITH ELIGIBILITY OF PAROLE AFTER 40 YEARS. COUNT 14 SHALL RUN CONCURRENT TO ALL OTHER COUNTS.
>
> AGGREGATE SENTENCE OF: LIFE WITH ELIGIBILITY OF PAROLE AFTER 40 YEARS.

(*Id.*).

On July 31, 2019, Mr. Cannon appealed to the Ninth District. (*Id.* at PageID 180). Contemporaneously, he sought leave for a delayed appeal pursuant to Rule 5 of the Ohio Rules of Appellate Procedure. (*Id.* at PageID 182-83). The Ninth District granted the motion and ordered merits briefing. (*Id.* at PageID 185).

Mr. Cannon's merits brief presented three assignments of error, as follows:

I.     The trial court erred in denying Appellant's Crim. R. 29 motion for acquittal on all of the charges, all of which were premised on complicity.

II.    As to all charges, the verdicts of guilt were against the manifest weight of the evidence and must be reversed.

III.   Appellant's convictions for the gun specifications are not supported by sufficient evidence where the State failed to present evidence that the Appellant shared the same mens rea as the principal offenders.

(*Id.* at PageID 188) (cleaned up).

After the Ninth District overruled the State's request for dismissal of the appeal based on no final appealable order (*Id.* at PageID 237-62), the State filed its merits brief (*Id.* at PageID 264-300). Mr. Cannon did not file a Reply Brief. On July 20, 2020, the Ninth District affirmed the trial court's judgment. (*Id.* at PageID 302-17; *see Cannon*, 2020 WL 4049925, at *1).

Mr. Cannon timely filed a notice of appeal to the Supreme Court of Ohio on August 14, 2020. (ECF #11-1 at PageID 334). His memorandum in support of jurisdiction presented three propositions of law, as follows:

1.    WHETHER THE TRIAL COURT'S DENIAL OF PETITIONER'S CRIMINAL RULE 29 MOTION FOR ACQUITTAL DEPRIVED HIM OF SUBSTANTIVE AND PROCEDURAL DUE PROCESS OF LAW?

2.    WHETHER PETITIONER'S CONVICTIONS ON ALL CHARGES ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED, AND REQUIRE REVERSAL?

3.  WHETHER PETITIONER'S CONVICTIONS FOR THE GUN SPECIFICATIONS ARE SUPPORTED BY SUFFICIENT EVIDENCE, WHERE THE STATE FAILED TO PRESENT EVIDENCE THAT THE PETITIONER SHARED THE SAME MENS REA AS THE PRINCIPAL OFFENDERS?

(*Id.* at PageID 337). The State waived responding. (*Id.* at PageID 362).

On September 29, 2020, the Supreme Court of Ohio declined jurisdiction. (*Id.* at PageID 365; *see also State v. Cannon*, 153 N.E.3d 114 (Ohio 2020) (table)). Mr. Cannon did not seek reconsideration nor did he file a petition for certiorari with the United States Supreme Court. Instead, he filed his petition in this court on September 28, 2021. (ECF #1).

### FEDERAL HABEAS CORPUS

Mr. Cannon's petition, filed through counsel, asserts three grounds for relief with supporting facts as follows:

**Ground One:** Trial court's denial of motion for acquittal deprived him of substantive and procedural due process.

**Supporting Facts:**
1.  There was no reliable testimony linking Petitioner to the charged crimes.
2.  There was no forensic or scientific evidence linking Petitioner to the charged crimes.
3.  No murder weapon was found nor was there any substantial investigation to locate same.
4.  There was no ballistic evidence linking Petitioner to the charged crimes.
5.  There was no medical evidence contradicting that Petitioner bled immediately, once he was shot.
6.  There was a missing bullet that was unaccounted for.
7.  There was no confession by Petitioner.
8.  There was no evidence found in the dumpster linking Petitioner to the charged crimes.
9.  The State's proffered burglary motive lacked a solid factual basis.
10. The notion that Petitioner would break into the apartment of a known gun dealer, and risk getting shot, defies good common sense.
11. The only evidence presented that linked Petitioner to the charged crimes was his presence and injury at the crime scene.

8

**Ground Two:** The convictions are against the manifest weight of the evidence.

**Supporting Facts:**
1.  There was no reliable testimony linking Petitioner to the charged crimes.
2.  There was no forensic or scientific evidence linking Petitioner to the charged crimes.
3.  No murder weapon was found nor was there any substantial investigation to locate same.
4.  There was no ballistic evidence linking Petitioner to the charged crimes.
5.  There was no medical evidence contradicting that Petitioner bled immediately, once he was shot.
6.  There was a missing bullet that was unaccounted for.
7.  There was no confession by Petitioner.
8.  There was no evidence found in the dumpster linking Petitioner to the charged crimes.
9.  The State's proffered burglary motive lacked a solid factual basis.
10. The notion that Petitioner would break into the apartment of a known gun dealer, and risk getting shot, defies good common sense.
11. The only evidence presented that linked Petitioner to the charged crimes was his presence and injury at the crime scene.

**Ground Three:** The convictions are not supported by sufficient evidence.

**Supporting Facts:** Petitioner never possessed a firearm. The State failed to present any evidence providing that Petitioner knew or had reason to believe that his alleged accomplices possess a firearm and intended to use it in the commission of a crime.

(ECF #1 at PageID 5-11) (cleaned up). He requests this Court vacate his convictions and remand the matter for a new trial. (*Id.* at PageID 18).

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs Mr. Cannon's petition for writ of habeas corpus. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). AEDPA recognizes that "[s]tate courts are adequate forums for the vindication of federal rights" and therefore acts as a "formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013). It "dictates a highly deferential

standard for evaluating state-court rulings which demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal citation and quotation omitted). Accordingly, an application for habeas corpus cannot be granted for a person in custody pursuant to a state conviction unless the adjudication "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d).

Habeas courts review the last explained state-court judgment on the federal claim at issue. *Ylst v. Nunnemaker*, 501 U.S. 797, 805 (1991). For purposes of § 2254(d)(1), clearly established federal law "is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). It includes "the holdings, as opposed to dicta, of [Supreme Court] decisions." *Williams v. Taylor*, 529 U.S. 362, 412 (2000).

A state court decision is contrary to Supreme Court precedent if the state court arrives at a conclusion opposite that reached by the Court on a question of law or if the state court decides a case differently than the Court has decided on a set of materially indistinguishable facts. *Williams*, 529 U.S. at 405; *White v. Mitchell*, 431 F.3d 517, 523 (6th Cir. 2005), *cert. denied*, 549 U.S. 1047 (2006). The word "contrary" means "diametrically different, opposite in character or nature, or mutually opposed." *Williams*, 529 U.S. at 405. A state court does not act contrary to clearly established law when the precedent of the Supreme Court is ambiguous or nonexistent. *See, e.g.,* *Mitchell v. Esparza*, 540 U.S. 12, 17 (2003) (per curiam).

10

A state court decision involves an unreasonable application of the Court's precedent if the state court identifies the correct governing legal rule from the Court's cases but unreasonably applies it to the facts of the state prisoner's case, or if the state court either unreasonably extends a legal principle from the Court's precedent to a new context where it should not be applied or unreasonably refuses to extend that principle in a new context where it should apply. *Williams*, 529 U.S. at 407. The appropriate measure of whether a state court decision unreasonably applied clearly established federal law is whether that state adjudication was "objectively unreasonable" and not merely erroneous or incorrect. *Id.* at 409-11; *see also Machacek v. Hofbauer*, 213 F.3d 947, 953 (6th Cir. 2000), *cert. denied*, 531 U.S. 1089 (2001). "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Under § 2254(d)(2), state court factual determinations stand unless they are objectively unreasonable in light of the evidence presented in state court. *Id.* at 100. The Supreme Court has repeatedly emphasized "a state court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion." *Burt*, 571 U.S. at 18.

Under federal law, "a determination of a factual issue made by a State court shall be presumed to be correct. [Petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2554(e)(1). Comity principles also require federal courts to defer to a state's judgment on issues of state substantive and procedural law. *Murray v. Carrier*, 477 U.S. 478, 491 (1986); *Engle v. Isaac*, 456 U.S. 107, 128-29 (1982). Federal courts must accept a state court's interpretation of its statutes and rules of practice. *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

The standard is intended to be difficult to meet and reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Harrington*, 562 U.S. at 102-03; *see also Brown v. Davenport*, 142 S. Ct. 1510, 1524 (2022) (describing habeas as an "extraordinary remedy, reserved for only extreme malfunctions in the state criminal justice system and different in kind from providing relief on direct appeal") (cleaned up). To obtain "habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Harrington*, 562 U.S. at 103.

When a properly presented federal constitutional claim was not adjudicated on the merits in the state courts, the reviewing federal court must apply the pre-AEDPA standard, reviewing *de novo* questions of law and mixed questions of law and fact. *Durr v. Mitchell*, 487 F.3d 423, 432 (6th Cir. 2007).

### PROCEDURAL BARRIERS TO FEDERAL HABEAS REVIEW

Before a federal court may review a petitioner's habeas claims on the merits, the petitioner must overcome several procedural barriers. These barriers limit a petitioner's access to review on the merits of a constitutional claim. *Daniels v. United States*, 532 U.S. 374, 381 (2001). Although several such barriers exist, I limit my discussion here to one that is pertinent to Mr. Cannon's petition – that state law claims are not cognizable on federal habeas review.

Under this principle, a district court lacks jurisdiction over a petitioner's claims for purposes of habeas corpus review unless the claims "challenge the legality of his custody" based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a).

12

Indeed, "[t]he writ of habeas corpus is not available to remedy errors of only state law." *Smith v. Morgan*, 371 F. App'x 575, 582 (6th Cir. 2010) (citing 28 U.S.C. § 2254(a)); *see also Norris v. Schotten*, 146 F.3d 314, 328 (6th Cir. 1998) ("A claim based solely on an error of state law is not redressable through the federal habeas process."). Moreover, merely asserting that a state law error violates the Federal Constitution does not justify jurisdiction. *See Wilson v. Corcoran*, 562 U.S. 1, 5 (2010); *see also Rivera v. Illinois*, 556 U.S. 148, 158 (2009) ("The Due Process Clause . . . safeguards not the meticulous observance of state procedural prescriptions, but the fundamental elements of fairness in a criminal trial.") (quotation omitted); *see also Engle*, 456 U.S. at 121 n.21 ("We have long recognized that a 'mere error of state law' is not a denial of due process.") (citation omitted).

Nonetheless, habeas relief may be available if an alleged error of state law subjected the petitioner to a "fundamentally unfair" criminal process. *Williams*, 460 F.3d at 816. "[T]he category of infractions that violate fundamental fairness is defined very narrowly," and includes only state rulings that "offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Bey v. Bagley*, 500 F.3d 514, 521 (6th Cir. 2007) (cleaned up). "A state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus." *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991)); *see also Allen v. Morris*, 845 F.2d 610, 614 (6th Cir. 1988) (stating that a federal habeas court does not function as an additional state appellate court reviewing state courts' decisions on state law or procedure). The habeas petitioner bears the burden of showing "the principle of procedure violated by the rule (and allegedly required by due process)" is fundamental. *Bey*, 500 F.3d at 521.

DISCUSSION AND ANALYSIS

**I.      Ground One should be dismissed because it does not raise a claim that can be considered in federal habeas corpus.**

In Ground One, Mr. Cannon alleges the trial court's denial of his Rule 29 motions denied him both substantive and procedural due process. (*See* ECF #1 at PageID 5). His petition cites the eleven supporting facts quoted above but does not otherwise explain why the trial court's decisions were erroneous. (*Id.* at PageID 5-7). His Traverse does not address Ground One at all. (*See* ECF #12).

To the extent Mr. Cannon argues the trial court erred in denying his Rule 29 motions, this claim is not cognizable on habeas review. As noted above, habeas jurisdiction extends only to claims challenging the legality of a petitioner's custody based on a "violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a). "The decision whether to grant a motion for acquittal pursuant to Ohio Crim. R. 29 is a matter of state law and is cognizable in habeas only if the denial of such a motion is a violation of due process." *Smith v. Bobby*, No. 5:04-cv-2353, 2005 WL 2076667, at *24 (N.D. Ohio Aug. 25, 2005), *report and recommendation adopted*, 2007 WL 2427999 (N.D. Ohio Aug. 21, 2007); *see also Small v. Warden*, No. 2:12-cv-0958, 2012 WL 3745834, at *4 (S.D. Ohio July 15, 2013) ("Petitioner's claim, as it relates to the trial court's denial of his motion for judgment of acquittal pursuant to Ohio Crim. R. 29 presents an issue of state law that cannot be reviewed in federal habeas corpus."), *report and recommendation adopted*, 2013 WL 9894270 (S.D. Ohio Aug. 19, 2013). Thus, because Mr. Cannon maintains the trial court erred under Ohio law when it denied his motions for acquittal, and because he does not further demonstrate how this denial is a fundamental violation of his federal due process rights, his claim does not present a question of federal law and is not cognizable on habeas review.

14

For these reasons, I recommend the District Court **DISMISS** Ground One.

**II.  Ground Two should also be dismissed because it is not cognizable in federal habeas corpus review.**

In Ground Two, Mr. Cannon argues his convictions are against the manifest weight of the evidence. (ECF #1 at PageID 9). Claims regarding the manifest weight of the evidence arise under state law and thus are not cognizable in federal habeas. *See, e.g.*, *Walker v. Engle*, 703 F.2d 959, 969 (6th Cir.) (stating that Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those convicted without sufficient proof to allow a finding of guilt beyond a reasonable doubt), *cert. denied*, 464 U.S. 951 (1983). The State argues as much in its Return of Writ, asserting Ground Two should be dismissed. (ECF #11 at PageID 55). Mr. Cannon makes no argument to the contrary in his Traverse. (*See* ECF #12).

I agree with the State. Federal habeas corpus relief is limited and so alleged errors in state law that do not violate a constitutional right are not cognizable. In *Hess v. Eberlin*, No. 2:04-cv-1144, 2006 WL 2090093 (S.D. Ohio Jul. 25, 2006), the court explained why a manifest weight of the evidence claim is not appropriate for consideration in federal habeas:

> To the extent that petitioner asserts here that his convictions are against the manifest weight of the evidence, such claim is not appropriate for federal habeas corpus review. The Due Process Clause does not provide relief for defendants whose convictions are against the manifest weight of the evidence, but only for those who have been convicted without enough proof to allow a rational trier of fact to find guilt beyond a reasonable doubt. In the context of a claim alleging a violation of due process, "sufficiency of the evidence" refers to the due process requirement that there be enough evidence introduced in favor of the prosecution for a rational trier of fact to find each element of the crime beyond a reasonable doubt. In reviewing a sufficiency of the evidence claim, a federal habeas court must defer to the trier of fact with respect to issues of conflicting testimony, weight of the evidence, and the credibility of the witnesses.

15

However, under Ohio law, a claim that a verdict was against the manifest weight of the evidence—as opposed to one based upon insufficient evidence—requires the appellate court to act as a "thirteenth juror" and review the entire record, weigh the evidence, and consider the credibility of witnesses to determine whether "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Since a federal habeas court does not function as an additional state appellate court, vested with the authority to conduct such an exhaustive review, any claim that petitioner's conviction was against the manifest weight of the evidence cannot be considered by this Court.

*Id.* at *6-7 (citations omitted).

The distinction is important, especially in the habeas context, because "the Due Process Clause forbids any conviction based on evidence insufficient to persuade a rational factfinder of guilt beyond a reasonable doubt. The Due Process Clause, in other words, sets a lower limit on an appellate court's definition of evidentiary sufficiency." *Tibbs v. Florida*, 457 U.S. 31, 45 (1982). That same Due Process protection does not apply to a manifest weight claim. *Id.*; *see also Johnson v. Williams*, No. 3:10CV0005, 2011 WL 1103890, at *2 (S.D. Ohio Mar. 3, 2011), *report and recommendation adopted*, 2011 WL 1100468 (S.D. Ohio Mar. 22, 2011); *Morris v. Hudson*, No. 5:06CV2446, 2007 WL 4276665, at *10 (N.D. Ohio Nov. 30, 2007). Manifest weight claims derive purely from state law whereby the state appellate court sits as a "thirteenth juror and disagrees with fact finder's resolution of conflicting testimony" and finds that the "jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Morris v. Hudson*, No. 5:06CV2446, 2007 WL 4276665, at *10 (N.D. Ohio Nov. 30, 2007). For these reasons, Mr. Cannon's manifest weight of the evidence claim is not cognizable in federal habeas corpus review. Moreover, Mr. Cannon does not argue that his conviction arises from an error of state law that subjected him to a "fundamentally unfair" criminal process.

Therefore, I recommend the District Court **DISMISS** Ground Two.

III.   **Ground Three provides no basis for habeas corpus relief.**

In Ground Three, Mr. Cannon argues his convictions were not supported by sufficient evidence. (ECF #11 at PageID 11). He specifically argues that (i) he never possessed a firearm and (ii) the State offered no evidence that Mr. Cannon "knew or had reason to believe that his alleged accomplices possess a firearm and intended to use it in the commission of a crime." (*Id.*) (cleaned up). The State does not argue that this claim is procedurally defaulted. (*See* ECF #11 at PageID 55-57). In his Traverse, Mr. Cannon elucidates his argument as follows:

> Petitioner's position is based upon the facts set forth in grounds one and three of his petition. These facts indicate that the lower court decisions resulted in an unreasonable application of federal law. First, the lack of forensic, scientific and ballistic evidence in a murder case is extremely troubling. The presentation of Petitioner's blood at the scene does NOT prove the charges or the specifications, it merely establishes Petitioner's presence at the scene – something he never denied. Second, the lack of a murder weapon should give any reasonably person great pause, in light of these serious charges. Also very troubling is the lack of any *reasonable* motive proffered by the State. When considered collectively, these facts raise a strong argument that both the jury and the appellate court simply got his case wrong. Even when viewed under the strict standards set forth by both the ***Jackson*** decision and AEDPA, these facts paint a compelling picture of actual innocence.

(ECF #12 at PageID 1363).

The due process clause requires the State prove beyond a reasonable doubt every fact necessary to constitute the charged offense. *In Re Winship*, 397 U.S. 358, 363-64 (1970). In *Jackson v. Virginia*, 443 U.S. 307 (1979), the Supreme Court established the standard for reviewing constitutional claims challenging the sufficiency of the evidence:

> [T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. . . . This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve

> conflicts in the testimony, to weigh the evidence and to draw reasonable inferences
> from basic facts to ultimate facts.

*Id.* at 319. Otherwise stated, a petitioner is entitled to habeas corpus relief if, based on the record evidence at trial and in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Id.* at 324. The Sixth Circuit has aptly described this standard as imposing a "'nearly insurmountable hurdle.'" *Davis v. Lafler*, 658 F.3d 525, 534 (6th Cir. 2011) (quoting *United States v. Oros*, 578 F.3d 703, 710 (7th Cir. 2009)).

Furthermore, the State does not have an "affirmative duty to rule out every hypothesis except that of guilty beyond a reasonable doubt." *Id.* at 326. Under this standard, "a federal habeas court faced with a record of historical facts that supports conflicting inferences must presume— even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.*

On federal habeas review of a claim challenging the sufficiency of the evidence, reviewing courts are bound by two layers of deference. First, in determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the federal court does not reweigh the evidence, reevaluate the credibility of witnesses, or otherwise substitute its opinion for that of the trier of fact. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009) (citing *United States v. Hilliard*, 11 F.3d 618 (6th Cir. 1993)). Thus, even if the federal court might not agree with the trier of fact's decision to convict, it must uphold the determination if any rational trier of fact could have found the defendant guilty after resolving all disputes in favor of the prosecution. *Id.* The second layer of deference, required under AEDPA, extends to the state appellate court's determination so long as it is not unreasonable. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008); *see also* 28 U.S.C. § 2254(d)(2). Additionally, as described above, comity

principles require federal courts to defer to a state's judgment on issues of state substantive and procedural law, *see Murray v. Carrier*, 477 U.S. 478, 491 (1986), and federal courts must accept a state court's interpretation of state law and its rules of practice, *Duffel v. Dutton*, 785 F.2d 131, 133 (6th Cir. 1986).

Here, the Ninth District thoroughly analyzed the evidence produced at trial and rejected Mr. Cannon's sufficiency-of-the-evidence challenge in his direct appeal, stating as follows:

### Assignment of Error I

**The trial court's denial of [Cannon's] Crim. R. 29 motion for acquittal despite insufficient evidence to sustain the convictions deprived [Cannon] of substantive and procedural due process in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 5, 9, and 16 of the Ohio Constitution.**

### Assignment of Error III

**[Cannon's] convictions for the gun specifications are not supported by sufficient evidence where the state failed to present evidence that [Cannon] shared the same mens rea as the principal offender(s).**

{¶ 12} In his first and third assignments of error, Cannon argues that his convictions and their attendant firearm specifications are based on insufficient evidence. We do not agree.

{¶ 13} This Court reviews the denial of a defendant's Crim.R. 29 motion for acquittal by assessing the sufficiency of the State's evidence. A challenge to the sufficiency of a criminal conviction presents a question of law, which we review de novo. In carrying out this review, our "function * * * is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.", paragraph two of the syllabus. After such an examination and taking the evidence in the light most favorable to the prosecution, we must decide whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

{¶ 14} As previously noted, Cannon was found guilty of aggravated murder, felony murder, kidnapping, aggravated robbery, aggravated burglary, felonious assault, tampering with evidence, and having weapons under disability. His sufficiency

19

challenge is not directed at any of the underlying elements of his various offenses. Instead, he argues that the State failed to prove either (1) his identity as the perpetrator, or (2) that he aided or abetted another in the commission of those crimes. Given the narrow focus of his argument, we decline to set forth the individual elements of his offenses. We limit our analysis to the issues Cannon has raised herein.

{¶ 15} As with any other element, "[t]he identity of a perpetrator must be proved by the State beyond a reasonable doubt." "[I]dentity may be proved by direct or circumstantial evidence, which do not differ with respect to probative value."

{¶ 16} "A person need not be the principal offender to be convicted of a crime." R.C. 2923.03(A)(2) prohibits any person, "acting with the kind of culpability required for the commission of an offense, [from] * * * [a]id[ing] or abet[ting] another in committing the offense." "To support a conviction for complicity by aiding and abetting * * *, the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal." "Such intent may be inferred from the circumstances surrounding the crime," and "the presence, companionship, and conduct of the defendant before and after the offense is committed." A purpose to kill may be inferred "'where the facts show that the participants in a felony entered into a common design and either the aider or abettor knew that an inherently dangerous instrumentality was to be employed to accomplish the felony or the felony and the manner of its accomplishment would be reasonably likely to produce death.'"

{¶ 17} D.B.'s twin brother testified that, sometime around 11:00 p.m., he called D.B. to let him know that he would be coming to stay with him for the evening. D.B. was already in bed when his brother arrived, so the brother let himself in, bolted the apartment door, and eventually fell asleep on the living room couch. He testified that he was heavily asleep when he heard a noise and opened his eyes. He then saw a figure standing over him and tried to jump up from the couch. His attempt was unsuccessful, however, as the figure struck him in the head. The twin brother testified that the room was dark, but the injuries he sustained were consistent with his having been struck by a gun. After someone struck him, a voice he did not recognize exclaimed, "Oh, sh*t," and gunfire broke out in the apartment.

{¶ 18} The twin brother testified that, when the shooting started, the person who was standing over him ran toward D.B.'s bedroom. Multiple shots were then fired with bullets "flying from the back of the [apartment]," and glass from the stove exploding in the hail of gunfire. As the twin brother watched, he saw a person run from the apartment, followed by a second person "tripping over his own feet." He testified that the second person was bleeding and left his blood on the wall next to

the door when he hit the wall on his way out of the apartment. Though the twin brother briefly chased after the two intruders, he came to his senses when he realized that he did not have a weapon and D.B. likely needed help. He then ran back up to the apartment, found his brother, and called 911.

{¶ 19} The twin brother was unable to describe the individuals who broke into the apartment, as it was dark inside when they attacked. He did confirm, however, that he only saw two people and a blood trail leading out of the apartment belonged to the second man. The twin brother acknowledged that D.B. was a drug dealer and owned a firearm. Yet, he denied that he or his brother had participated in a drug deal that evening. The State showed the twin brother a photograph of the front door of the apartment, and the photograph captured a partial shoe print on the door and damage from the door having been kicked in while the deadbolt was engaged. The twin brother confirmed that the damage was not present when he arrived at the apartment earlier that evening.

{¶ 20} A man from a neighboring apartment testified that he, his girlfriend, and their children were sleeping when they were awoken by the sound of gunshots. The neighbor's bedroom window faced the parking lot for the apartment complex and, as he dialed 911, he looked outside. The neighbor testified that he saw two men running. The first man ran toward a sports utility vehicle and jumped into the passenger's seat as the vehicle pulled out. Meanwhile, the second man ran along the right side of a smaller building that housed the complex's dumpster. The neighbor testified that the vehicle drove out onto the main roadway, but stopped briefly in a spot near the dumpster. He could not say exactly how many people were in the vehicle, but acknowledged that there must have been at least three: the two men he saw running and the driver.

{¶ 21} A registered nurse from the emergency room at Elyria Medical Center testified that he received a phone call from the police at 3:10 a.m. The police notified the nurse that a shooting had occurred in the city and asked that the hospital contact the department if any individuals sought treatment for a gunshot wound. Less than twenty minutes later, Cannon arrived at the emergency room with a gunshot wound to his right elbow. The nurse testified that Cannon had extremely low blood pressure when he arrived and was heading into hypovolemic shock from significant blood loss. Cannon informed the nurse that he had been walking with a friend in Lorain when another man approached them, words were exchanged, and shots were fired. Cannon told the nurse that he was very concerned for his friend because they had run in separate directions. He also told the nurse that a female friend had driven him to the emergency room. The nurse testified that, once the Elyria Medical Center stabilized Cannon, an ambulance took him to the Cleveland Medical Center for additional treatment.

{¶ 22} Officer Brent Payne was at D.B.'s apartment for no more than fifteen minutes when he received notice that a male was seeking treatment for a gunshot wound at Elyria Medical Center. He testified that it took him about fifteen minutes to drive there, as Elyria Medical Center was not the closest hospital. When he arrived, Cannon was being treated in one of the emergency rooms and he was able to speak with him. Cannon told Officer Payne that he had been drinking at a bar in Lorain when several unknown males attempted to rob him. He indicated that one of the men had shot him and a good Samaritan had driven him to the hospital. A security guard was present when Cannon arrived and was able to provide Officer Payne with a description of the vehicle that had brought Cannon to the hospital. The officer then advised law enforcement to be on the lookout for that vehicle.

{¶ 23} Detective Buddy Sivert also responded to Elyria Medical Center and spoke with the security guard and Cannon. He learned from the security guard that one male had dropped off Cannon at the drive-up entrance to the emergency room. He then spoke with Cannon, who repeated his claim that he had been shot at a bar in Lorain when two men tried to rob him. Cannon indicated that he was not sure who had brought him to the hospital, and he specifically denied that he had been shot at D.B.'s apartment. In addition to taking Cannon's statement, Detective Sivert tried to take pictures of Cannon's face. He testified that Cannon refused to open his eyes, however, and kept turning his head slightly to the side.

{¶ 24} The State introduced evidence that Cannon was transferred to Cleveland Medical Center for additional treatment at 5:01 a.m. and left against medical advice at 9:15 a.m. Detective Kurt Graupmann testified that, by the time the police secured a warrant for Cannon's arrest, he had already left the hospital. The detective spoke with Cannon's mother and sister several times in an effort to locate him, but they changed their stories each time he spoke with them. In fact, Cannon's mother denied knowing anything about Cannon leaving the hospital until the detective confronted her with a surveillance video, showing that she was the one who picked him up. The detective testified that Cannon managed to elude the police for almost four weeks, at which point they received a tip that he was staying at an apartment in Kent. Members of the fugitive task force then found Cannon inside the apartment, hiding beneath a pile of clothes, and arrested him.

{¶ 25} A DNA analyst from the Bureau of Criminal Identification ("BCI") testified that the police asked him to test four blood samples they collected from D.B.'s apartment, the stairwell, and the parking lot. He initially tested the samples without a standard for comparison and concluded that all four swabs contained the same male profile. Once the police obtained Cannon's DNA, the analyst performed additional testing using Cannon's standard. He then was able to determine that Cannon could not be excluded as the source of the male profile he uncovered on the blood samples taken from D.B.'s apartment and the surrounding area.

22

{¶ 26} Detective Christopher Kovach testified that, the same day as the shooting, the Cleveland Police Department recovered the vehicle that had brought Cannon to Elyria Medical Center. The vehicle was "engulfed in flames" when the Cleveland Police found it and investigators determined that the fire had been set intentionally. Detective Kovach testified that the police were able to trace the car to an Enterprise Rental. The manager from that branch testified that Cannon had rented a car about three weeks before the shooting and, in that three-week period, had made two vehicle exchanges. The vehicle that was destroyed on the day of the shooting was the third vehicle Cannon had received from the company.

{¶ 27} Detective Kovach testified that the police only recovered one handgun inside D.B.'s apartment. That handgun was a .40 caliber semi-automatic, and it was found at D.B.'s feet when officers arrived on scene. The police found a total of eleven casings inside the apartment and, among those eleven casings, three different bullet brands. Detective Kovach specified that the police found (1) seven .45 caliber Hornady brand casings, (2) three .40 caliber Winchester casings, and (3) one .40 caliber Federal brand casing. The Federal brand casing was discovered just behind the couch in the living room, and the three Winchester casings were discovered inside D.B.'s bedroom. Meanwhile, one Hornady casing was found in the living room, and the remaining six were found on the floor of a back bedroom that D.B. used as a music studio. Detective Kovach testified that it was impossible to determine the order in which the bullets had been fired. Yet, the police were able to determine that three shots had been fired from D.B.'s bedroom (the Winchesters), seven had been fired from the music studio room and/or hallway outside D.B.'s bedroom (the Hornadys), and one had been fired in the living room (the Federal). Detective Kovach indicated that he was ultimately able to account for ten of those bullets, as there was evidence that they had either struck D.B. or were lodged in walls, floors, or other areas of the apartment. Though he could not account for the eleventh bullet that had been fired, there was testimony that the police were never able to test the bullet that lodged itself in Cannon's right arm.

{¶ 28} A firearms analyst from BCI tested the bullets, bullet fragments, and casings recovered from the scene. He testified that all three Winchester rounds had been fired from the handgun found at D.B.'s feet. Because no additional handguns were recovered, he was unable to match either the Hornady rounds or the Federal round to a specific firearm. Nevertheless, he testified that all seven Hornady rounds had been fired from the same handgun. He also was able to testify that the Federal round had been fired from a different handgun; most likely a .40 caliber Smith & Wesson Sigma series handgun. The analyst confirmed that the testing he performed supported the conclusion that three different firearms had been fired in the apartment at the time of the shooting.

{¶ 29} Viewing all of the evidence in a light most favorable to the State, a rational trier of fact could have concluded that the State proved, beyond a reasonable

doubt, that Cannon either perpetrated the offenses herein or aided and abetted another in perpetrating those offenses. The State produced evidence that two men broke into D.B.'s apartment, one of those men was shot before he fled, and that man was Cannon. The twin brother testified that he saw both intruders run from the back of the apartment where D.B. was located, and the evidence showed that three handguns were fired that evening: D.B.'s handgun and two others. The jury, therefore, reasonably could have concluded that Cannon brought a gun with him to the apartment, fired it at least once during the affray, and took it with him when he fled. Moreover, the jury reasonably could have concluded that his actions demonstrated a consciousness of guilt. Cannon was not forthcoming about the events that transpired and attempted to evade apprehension. There was testimony that he repeatedly lied about having been shot elsewhere, left the hospital against medical advice, concealed his whereabouts for almost four weeks, and attempted to hide in a pile of clothing when the police finally came to arrest him. Even if Cannon did not act as the principal herein, the State produced a wealth of evidence tending to show that he shared the principal's criminal intent and actively supported or assisted the principal in the commission of his crimes. We, therefore, cannot conclude that his convictions are based on insufficient evidence. Cannon's first and third assignments of error are overruled.

(ECF #11-1 at PageID 306-14 (citations omitted); *see also Cannon*, 2020 WL 4049925, at *2-6).

Nothing in this analysis supports a conclusion that the Ninth District unreasonably applied Supreme Court precedent or unreasonably determined the facts in light of the evidence presented at trial. The Ninth District's opinion specifically addresses the supporting facts Mr. Cannon invokes in support of Ground Three and demonstrates why they do not justify habeas relief from this Court. Even if Mr. Cannon never personally possessed a firearm, he was equally liable under Ohio criminal law as an aider and abettor. *See* Ohio Rev. Code § 2923.03(A)(2). And the Ninth District explicitly found that Mr. Cannon "shared the principal's criminal intent and actively supported or assisted the principal in the commission of his crimes," which refutes his assertion here that the State did not prove he knew or had reason to believe his alleged accomplices possessed a firearm and intended to use it in furtherance of a crime. (ECF #11 at PageID 11).

Further, contrary to the assertions in Mr. Cannon's Traverse, federal law does not require forensic, scientific, or ballistic evidence to support a murder conviction. *See Gipson v. Sheldon*, 659 F. App'x 871, 882 (6th Cir. 2016) (explaining that "lack of physical evidence does not render the evidence presented insufficient; instead it goes to weight of the evidence, not its sufficiency"). Rather, in the habeas corpus context, federal law recognizes as valid a conviction for any underlying offense when it is supported by "substantial and competent evidence upon the record as a whole . . . whether the evidence is direct or wholly circumstantial." *See United States v. Stone*, 748 F.2d 361, 363 (6th Cir. 1984); *see also Saxton v. Sheets*, 547 F.3d 597, 606 (6th Cir. 2008) ("A conviction may be sustained based upon nothing more than circumstantial evidence."); *Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002) ("A conviction may be based upon circumstantial evidence as well as inferences based upon the evidence."). Nor does federal law require that a murder weapon itself be produced at trial to support a conviction. *See, e.g., King v. Mantello*, No. 1:98-CV-7603, 2002 WL 32100251, at *16 (E.D.N.Y. Nov. 19, 2002) (rejecting petitioner's challenge to the sufficiency of the evidence supporting his second-degree murder conviction based on, *inter alia*, "the police's failure to recover the murder weapon"), *report and recommendation adopted*, 2003 WL 1873618 (E.D.N.Y. Apr. 11, 2003). Finally, although Mr. Cannon's Traverse invokes "actual innocence," he does not present any new reliable evidence that was not presented at trial and is so strong a court cannot have confidence in the outcome of his trial.

For these reasons, I recommend the District Court **DENY** any relief pursuant to Ground Three.

### CERTIFICATE OF APPEALABILITY

A habeas petitioner may not appeal the denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability (COA) and specifies the issues that can be raised on appeal. 28 U.S.C. § 2253(c). "A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Where a district court has determined a petitioner's constitutional claim to be without merit, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong" before receiving a COA. *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). When the district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether (i) the petition states a valid claim of the denial of a constitutional right and (ii) the district court was correct in its procedural ruling. *Id.* A showing that the appeal would succeed on the claim is not required to grant a COA. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003).

Mr. Cannon has made no substantial showing of the denial of any constitutional right. Jurists of reason would not find it debatable whether the grounds for relief are valid claims of the denial of constitutional rights. Similarly, no procedural ruling appears to be in error. Therefore, I recommend the District Court not grant Mr. Cannon a COA as to any ground.

### CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I recommend the District Court **DISMISS** Grounds One and Two and **DENY** any relief on Ground Three. Finally, I recommend the District Court **DENY** a Certificate of Appealability.

Dated: January 26, 2024

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).